UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
* * *

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 2:11-cr-438-MMD-CWH |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF UNITED STATES MAGISTRATE** |
| DARREN LAMONT MCCOY | **)** | **JUDGE** |
| | ) | |
| Defendant. | ) | |
| | ) | |

      This matter was referred to the undersigned Magistrate Judge on Defendant Darren McCoy's Amended Motion to Suppress (#36), filed June 12, 2012; the Government's Response (#43), filed June 26, 2012; and Defendant's Reply (#51), filed July 4, 2012. The Court conducted an evidentiary hearing on this matter on July 20, 2012.

## I. BACKGROUND

      On November 3, 2011, Detective Sean Beck ("Beck"), a member of the Las Vegas Metropolitan Police Department ("Metro"), began coordinating surveillance of Defendant Darren McCoy ("Defendant") at the request of Metro's Robbery Detail. Defendant was a suspected participant in an ongoing series of armed robberies that occurred at small businesses, such as a Subway sandwich store. Beck was briefed on the methodology used to commit the robberies; the suspect was a black male, wore all dark clothing including a black hoodie and mask, and used a large frame silver revolver with a gold hammer in the commission of the crime. Beck was also

briefed that Defendant had two prior felony convictions and a prior arrest for possession of a firearm.  Beginning on November 4, 2011, Beck coordinated efforts to conduct physical surveillance of Defendant almost every day.

The surveillance revealed that Defendant was the driver or passenger of a green 1995 Oldsmobile Aurora on at least two occasions.  At approximately 11:00 p.m. on November 14, 2011, Beck and Detective John Ducas installed a Global Positioning System ("GPS") device on the vehicle while it was parked next to the curb on a public road in Las Vegas.  The GPS device was installed in the presence of and with verbal approval of Beck's supervisor and no warrant was obtained for its installation and use.  The device was used to ascertain the location of the vehicle and was monitored through an internet-based software system.

At approximately 6:00 p.m. on November 17, 2011, Beck's team located the suspect vehicle using the GPS device.  They began surveillance of Defendant with a helicopter and officers on the ground.  Sergeant Dave Gifford ("Gifford"), the observer in the helicopter, testified that the helicopter performed orbits of the Defendant's location at a distance of about 4000 feet.  He conducted surveillance with the use of an infrared device with zoom capability; Gifford described his view as similar to a black and white television picture.  He testified to periodically reporting his observations by radio to other surveillance team members.

Gifford reported that he located the suspect vehicle near a shopping center on Ann and Drexell Roads, which had a Pizza Hut store.  Although parking spots were available in front of the Pizza Hut, the suspect vehicle was parked on a street adjacent to the shopping center.

Defendant[1] was observed approaching the Pizza Hut at the edge of the shopping center.  Gifford reported that the suspect was wearing a dark hooded sweatshirt and standing outside the Pizza Hut under some trees near a trash dumpster.  He found it peculiar that Defendant never entered the Pizza Hut, but rather made several approaches and retreats into the trees as pizza delivery drivers went in and out.  At one point, Gifford reported that Defendant went to the suspect vehicle to retrieve an item from the trunk and returned to the trees near the Pizza Hut.  Gifford testified that he believed Defendant was attempting to remain concealed from view while he "cased" the Pizza Hut.

Gifford continued his aerial surveillance of Defendant as he drove away from the Pizza Hut.  He observed the vehicle make numerous u-turns until it ended up near a shopping center located at Craig Road and Rancho Road.  Gifford testified that these u-turns were unusual and he believed Defendant was trying to avoid being followed.  Defendant temporarily stopped the suspect vehicle in a parking lot generally across the street from the shopping center.  Eventually, Defendant parked the vehicle on a street adjacent to and at the rear of the shopping center, which contained a Subway store.  Gifford observed Defendant walk into the shopping center through an alleyway behind the various businesses in the shopping center.[2]  Gifford indicated that Defendant "dove into the bushes" as another person approached.  He believed this was an effort to evade detection.  Gifford then observed Defendant stand behind a support column located in front of

---

[1] Gifford did not identify Defendant as the person who he observed, but testified that he maintained constant observation of the person, either in the vehicle or while walking, from the time the surveillance started until the person was arrested by officers.  For this reason, the recommendation will identify that person as the Defendant.

[2] Government Exhibit 10 contains letter A representing the location of the suspect vehicle and letter B representing the location of the Subway store.

3

the Subway store.  Gifford observed Defendant put something over his head and enter the

Subway.  Within a few minutes, he saw Defendant sprint out of the Subway, make rapid turns to

the back of the building, and dart into the alleyway in the direction of his parked vehicle.  Finally,

Gifford saw law enforcement officers converge upon him and place him on the ground.

In addition to receiving the air support from Gifford, Beck received reports from the other

officers on a regular basis throughout the operation.  He testified that it was his duty to record the

observations of the officers involved in the surveillance on November 17, 2011.  For example,

Beck reported receiving radio transmissions from Detective Kinch ("Kinch") while Defendant

was located near the Pizza Hut.  Kinch reported that he observed Defendant in the vicinity of the

Pizza Hut wearing a black hoodie jacket and, at one point, a black mask over his face.  Kinch

also reported that Defendant appeared to be standing in the shadows in an attempt to be

concealed.  At this point, Beck suspected that Defendant was preparing to rob the Pizza Hut.

This conclusion was based upon previous information known about the methodology of the

robberies he was investigating, where Defendant parked the suspect vehicle in relation to the

Pizza Hut, his efforts to evade detection, and the brief wearing of a mask over his face.

After Defendant left the Pizza Hut area, Beck followed his movements with Gifford's

assistance until locating the suspect vehicle near the shopping center on Craig and Rancho.  Beck

testified that he believed it was unusual for Defendant to park so far away from the Subway if he

intended to purchase food there.  Beck testified that he also received reports from Detective

Giannone ("Giannone") who was located across the street from the shopping center.  Using

binoculars, Giannone spotted Defendant near the Subway store.  He reported that he saw the

Defendant place a mask over his face, pull the hood of his jacket onto his head, enter the

4

Subway, and run out one to two minutes later.  Beck received Giannone's report that a robbery was in progress and ordered other officers to immobilize Defendant's vehicle.  Beck drove into the alleyway towards the Subway and intercepted Defendant on foot.  Beck identified himself as a police officer and loaded a round into his shotgun based on his belief that Defendant was armed and dangerous.  He ordered Defendant to stop, which Defendant did not do.  When Beck issued the order again, Defendant stopped, put his hands up, turned his back to Beck, and reached towards his belt with his right hand.  A few seconds later, Beck observed Defendant place his hands in the air and comply with the order to get on the ground.

Detective Cord ("Cord"), who assisted in immobilizing the vehicle being used by Defendant, arrived to support Beck.  Cord arrested Defendant and immediately conducted a search incident to arrest.  He recovered a black mask, cash from Defendant's pocket, and a large frame silver revolver with a gold hammer from his waist.  On December 14, 2011, the Grand Jury returned an Indictment against Defendant charging him with one count of Felon in Possession of a Firearm in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

## II.  DISCUSSION

Defendant has moved to suppress all evidence seized incident to his arrest based on lack of probable cause.  This includes the weapon, ammunition, mask, post-arrest statements, drugs seized from the vehicle, and drugs seized from a purse located at 1914 Cosmic Way, Las Vegas.[3]  Defendant further moves to suppress evidence obtained as the result of the warrantless placement

_____

[3] The Government indicated that it does not intend to introduce evidence of drugs or paraphernalia in its case in chief, but reserves its rights to do so if it becomes relevant.

of a GPS device on the suspect vehicle and any evidence seized as the result of the use of thermal imaging.

### A.  Installation and Use of the GPS Device

Citing *United States v. Jones*, — U.S. —, 132 S.Ct. 945 (2012), Defendant requests that the Court suppress all evidence and information obtained as a result of the warrantless GPS installation and surveillance that occurred during the period of November 14, 2001 through November 17, 2011.  Specifically, such evidence includes all physical evidence seized from the vehicle on November 17, 2011and any observations by law enforcement officers indicating that Defendant was reconnoitering potential locations for criminal activity.  The Government challenges Defendant's standing to suppress such evidence.  Citing this Court's recent decision in *United States v. Fata*, No. 2:11-cr-00188-RLH-CWH, 2012 WL 1715496 (D. Nev. Mar. 15, 2012), the Government argues that, even assuming standing, the "good faith" doctrine prevents the application of *Jones* because law enforcement officers relied on binding appellate precedent.

#### 1.  Standing

As a threshold matter, the Court will address whether Defendant has standing to contest the attachment or use of the GPS device.  The Court notes that the motion to suppress is based on the claim that Metro detectives violated the Fourth Amendment through the warrantless installation and monitoring of a GPS device.

It is axiomatic that an individual seeking to exclude evidence allegedly obtained in violation of the Fourth Amendment must have standing to challenge the illegal conduct that led to the discovery of the evidence.  *United States v. Pulliam*, 405 F.3d 782, 785-786 (9th Cir. 2005) (*citing Rakas v. Illinois*, 439 U.S. 128, 134 (1978)) (finding defendant did not have standing to

challenge the search of a car in which he was a passenger and seizure of the gun found in the car did not violate his Fourth Amendment rights).  The proponent of a motion to suppress has the burden of establishing that his Fourth Amendment rights were violated by the challenged search or seizure.  *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005) (citation omitted) (finding defendant failed to show he had reasonable expectation of privacy in laptop seized by police).  "To invoke the protections of the Fourth Amendment, a person must show he had a 'legitimate expectation of privacy.'" *United States v. Nerber*, 222 F.3d 597, 599 (9th Cir. 2000). To establish a legitimate expectation of privacy a person must show (1) a subjective expectation of privacy (2) that society is prepared to recognize as objectively reasonable.  *Id.* (*quoting Smith v. Maryland*, 442 U.S. 735 (1979).  "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134.

As a general matter, a person does not possess a reasonable expectation of privacy in a vehicle in which he has no lawful ownership or possessory interest.  *See id*. at 148-49 (noting a passenger who asserts neither a possessory nor property interest in a vehicle does not have a legitimate expectation of privacy in the vehicle); *see also United States v. Thomas*, 447 F.3d 1191, 1197 (9th Cir. 2006) (finding unauthorized driver has no privacy interest in a rental car). Even so, "possessory or ownership interests" are not narrowly defined.  447 F.3d at 1197.  "A reasonable expectation of privacy may be shown 'either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Id.* (*quoting* 439 U.S. at 142 n. 12).  Thus, even though a defendant may lack an ownership interest,

he may have standing to challenge a search upon showing "joint control" or "common authority." *Id*. at 1198.

In *Thomas*, the Ninth Circuit stated that "[c]ommon authority rests 'on mutual use of the property by persons generally having joint access or control for most purposes.'" *Id*. (*quoting Illinois v. Rodriguez*, 497 U.S. 177 (1990)).  For example, in *United States v. Portillo*, 633 F.2d 1313, 1317 (9th Cir. 1980), the Ninth Circuit held that the defendant who was driving the vehicle with the owner's permission had standing to challenge the propriety of the search of the trunk. However, citing the Supreme Court's decision in *Rakas*, the Ninth Circuit refused to extend standing to the passenger who asserted neither property nor possessory interest in the vehicle.  *Id*.

There is nothing in the record to find that Defendant had an ownership or possessory interest in the vehicle.  Defendant does not own the vehicle.  No evidence has been submitted showing that Defendant was operating the vehicle with permission of the rightful owner. Defendant was observed driving or riding in the vehicle on two occasions during the surveillance period.  However, there is no evidence demonstrating that Defendant drove the vehicle with permission of the owner, knowledge of the owner, or permission of a third party who had permission to use the vehicle.  As a passenger with no ownership or possessory interest in the car, Defendant "'has no reasonable expectation of privacy . . . that would permit [his] Fourth Amendment challenge to a search of the car.'" *United States v. Twilley*, 222 F.3d 1092, 1095 (9th Cir. 2000) (alteration in original) (citations omitted).  Therefore, Defendant has not carried his burden to show that he has Fourth Amendment standing to challenge the placement and use of the GPS device on the vehicle.

## 2.  Fourth Amendment Search

8

Even if Defendant had standing to challenge the use of the GPS device, the result would be the same.  The installation of a GPS device on a vehicle and use of that device to monitor the vehicle's movements constitutes a search within the meaning of the Fourth Amendment.  *See Jones*, 132 S.Ct. 945.  Similar to *Jones*, the GPS device in this case was used to gather information alerting law enforcement of Defendants' travel and whereabouts in Las Vegas during the period of November 14, 2011 through November 17, 2011.  *Id.*  The device was also used to assist in locating the vehicle on November 17, 2011.  There is no question that placement of the GPS device without a warrant violated the Fourth Amendment in this case.  However, the violation of a constitutional right does not automatically trigger the exclusionary rule.

### 3.  Application of *Davis* – The Good Faith Exception

The Supreme Court has held that the exclusionary rule "is a 'prudential' doctrine . . . created by this Court to 'compel respect for the constitutional guaranty.'"  *Davis v. United States*, — U.S. —, 131 S. Ct. 2419, 2426 (2011) (*citing Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 363 (1998) and *Elkins v. United States*, 364 U.S. 206, 217 (1960)).  The sole purpose of the exclusionary rule "is to deter future Fourth Amendment violations."  *Id.*  The Supreme Court has "limited the [exclusionary] rule's operation to situations in which this purpose is 'thought most efficaciously served.'"  *Id*. (citing *United States v. Calandra*, 414 U.S. 338, 348 (1974)).  "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs."  131 S. Ct. at 2427 (citation omitted).

In *Davis*, the Supreme Court addressed whether the exclusionary rule should apply when law enforcement officers act in objectively reasonable reliance on binding judicial precedent that is subsequently overruled.  *Id.*  The facts of *Davis* are generally analogous to the present case.  *Id.*

9

In *Davis*, the defendant was convicted of being a felon in possession of a weapon.  *Id.*  In compliance with existing Eleventh Circuit precedent, the weapon was seized during a vehicle search conducted incident to Davis' arrest and after he was secured in a police vehicle.  While Davis' appeal was pending, the Supreme Court issued its decision in *Arizona v. Gant*, 556 U.S. 332 (2009).  In light of *Gant*, the search of Davis made incident to his arrest violated his Fourth Amendment rights.  *Id.*  However, the Supreme Court, in applying its "good faith" line of cases, beginning with *United States v. Leon*, 468 U.S. 897 (1984), held that the "harsh sanction of exclusion should not be applied to deter objectively reasonable law enforcement activity."  131 S. Ct. at 2429.  Specifically, the Court held that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule."  *Id.*  The only deterrent of excluding evidence obtained when officers conduct themselves in conformity with binding appellate precedent, even if later found to be unconstitutional, is "to discourage the officer from doing his duty."  *Id.* (citations omitted).

In *United States v. Pineda-Moreno*, — F.3d — , 2012 WL 3156217 (9th Cir. Aug. 6, 2012), the Ninth Circuit held that the placement of a GPS device on a vehicle located in a private driveway, and subsequent monitoring of the device, did not violate the Fourth Amendment.  In this case, Metro detectives placed a GPS device on a vehicle and used it in a manner nearly indistinguishable from the facts in *Pineda-Moreno*.  *Id.*  The device was of similar technological capability as the device in *Pineda-Moreno*.  *Id.*  It was installed while the vehicle was parked in a public street, a place where the expectation of privacy is less than in a private driveway.  Also, like in *Pineda-Moreno*, the device alerted law enforcement to Defendant's location, which ultimately led to his arrest.  *Id.*

10

Based on the foregoing, the Court finds that the installation and use of the GPS device in this case was lawful under *Pineda-Moreno*. *Id.* Consistent with the Supreme Court's decision in *Davis*, the Court finds that the purpose of the exclusionary rule would not be served in this instance by suppression based on placement of the GPS device. 131 S. Ct. 2219. Placement of the GPS device and the subsequent monitoring were done in reasonable reliance on then binding appellate precedent as announced in *Pineda-Moreno*. 2012 WL 3156217; *see also United States v. Aguilar*, 2012 WL 1600276 (D. Idaho May 7, 2012) (denying motion to suppress evidence obtained from use of a GPS device because binding precedent in the Ninth Circuit established that the warrantless attachment did not violate the Forth Amendment); *see also United States v. Heath* 2012 WL 1574123 (D. Mont. May 3, 2012) (finding officers acted in good faith reliance on existing federal law, their reliance was objectively reasonable, and the evidence obtained pursuant to a warrantless GPS device is not subject to the exclusionary rule).

**B.  Use of Thermal Imagery**

Citing *Kyllo v. United States*, 533 U.S. 27 (2001), Defendant requests that the Court suppress all evidence and information obtained as a result of the illegal use of a thermal imaging device. In *Kyllo*, the Supreme Court held that the use of thermal imaging to obtain information regarding the interior of a home constituted a search. *Id.* at 34-35. In this case, thermal imaging technology was used by the police helicopter to enhance Gifford's observations of Defendant. Significantly, Gifford used such technology to observe Defendant as he visited public areas, namely, the areas surrounding the Pizza Hut and the Subway. The Supreme Court has held that what a person knowingly exposes to the public is not a subject of Fourth Amendment protection. *Katz v. United States*, 389 U.S. 347, 351 (1967). Defendant knowingly exposed his activities

11

around the Pizza Hut and the Subway to the public.  Accordingly, there is no factual basis to support the motion to suppress with respect to the visual observations of Gifford while he used the thermal imaging technology.

### C.  Seizure of the Weapon

The Fourth Amendment addresses "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."  U.S. Const. Amend. IV. It protects reasonable and legitimate expectations of privacy.  389 U.S. at 351.  Notably, the Fourth Amendment protects "people not places."  *Id*.  Evidence obtained in violation of the Fourth Amendment along with evidence derived from the unlawful action may be suppressed as the "fruit of the poisonous tree."  *Wong Sun v. United States*, 371 U.S. 471 (1963).

A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause.  *Maryland v. Pringle*, 540 US 366, 370 (2003); *see also, Atwater v. Lago Vista*, 532 US 318, 354 (2001) ("If an officer has probable cause to believe an individual committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.")

Conclusive evidence of guilt is not necessary to establish probable cause, but mere suspicion, common rumor, or even strong reason to suspect are not enough.  *Henry v. United States*, 361 U.S. 98, 101 (1959).  There must be some objective evidence that would allow a reasonable officer to deduce that a particular individual has committed or is in the process of committing a criminal offense.  See, e.g., *Beck v. Ohio*, 379 U.S. 89, 93-95 (1964) (noting no decision of the Supreme Court has upheld the constitutional validity of a warrantless arrest with

such scant support as presented by the record); *United States v. Buckner*, 179 F.3d 834, 837 (9th Cir. 1999) ("Probable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime." (*citing* United States v. Garza, 980 F.2d 546, 550 (9th Cir. 1992))); *cf. McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. Nev. 1984) (finding insufficient information to support probable cause).  Accordingly, a warrantless arrest is illegal without probable cause.

### 1.  Probable Cause for the Arrest

Beck testified that, at the time of arrest, he believed Defendant had just committed an armed robbery.  Gifford and Giannone reported that Defendant lingered in the shadows outside the Subway, raised his hood over his head, and placed a mask over his face before entering the Subway.  They reported observing Defendant sprint out of the Subway one to two minutes later in the direction of his vehicle.  Based on his experience as a law enforcement officer, Beck believed that Defendant's actions were consistent with those of a person committing a robbery.  Moreover, Beck knew the modus operandi of suspect who had committed the prior robberies.  Specifically, the suspect wore a black hoodie and a black mask, as in this case, and the target of previous robberies had been small businesses like the Subway.  Beck also received information leading him to believe that Defendant "cased" the Pizza Hut; this included observing Defendant watch the Pizza Hut for about 30 minutes while attempting to conceal his presence behind some trees and place a black mask over face.  Additionally, Beck knew Defendant had prior felony

convictions including the use of a firearm.[4]  Defendant argues that, at the moment of arrest, probable cause did not exist because there had been no confirmation that a robbery had been committed.  This is not the standard to be applied.  There must be some objective evidence that would allow a reasonable officer to deduce that a particular individual has committed or is in the process of committing a criminal offense, *see Beck, supra*, or a fair probability that a crime had been committed, *see Buckner, supra*.  Under these circumstances, the Court finds that Beck had reasonably trustworthy information to warrant his belief that Defendant had committed a robbery at the Subway.  Therefore, there was probable cause for the arrest.

### 2.  Search Incident to Arrest

Cord seized the weapon and related evidence from Defendant incident to his arrest.  A search incident to a lawful arrest is one of the "few specifically established and well-delineated exceptions" to the warrant requirement of the Fourth Amendment.  389 U.S. at 357.  Such a search is conducted for the twin purposes of finding weapons the arrestee might use or evidence the arrestee might conceal or destroy.  *Preston v. United States*, 376 U.S. 364, 367 (1964).  In the Ninth Circuit, the determination of the validity of a search incident to arrest is a two-fold inquiry: (1) was the searched item "within the arrestee's immediate control when he was arrested" and (2) did "events occurring after the arrest but before the search ma[k]e the search unreasonable?" *United States v. Turner*, 926 F.2d 883, 887 (9th Cir. 1990).  Both questions can be answered in the affirmative in this case.  The items seized were from Defendant's person and there was probable cause to arrest him.  Accordingly, the motion to suppress evidence seized from

---

[4] An officer may consider a suspect's criminal history as a factor to justify an investigatory stop or detention.  *United States v. Davis*, 636 F3d 1281, 1291 (10th Cir. 2011).

14

Defendant's person is denied.[5]

Based on the foregoing and good cause appearing therefore,

### RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress (#36) be **denied.**

### NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 9th day of August, 2012.

_____
C.W. Hoffman, Jr.
United States Magistrate Judge

---

[5] Because the Court finds that Defendant's arrest was based on probable cause, it will not analyze the Government's alternative theory that the evidence, including the weapon, would have been inevitably discovered pursuant to a "stop and frisk" of Defendant.  *See Terry v. Ohio*, 392 U.S. 1, 19-20 (1968).

15